AT&T Good morning, may it please the members of the court. I'm Catherine Williams on behalf of the plaintiff appellate Beverly Hawkins. Your honors, the crux of the reason why we are here today is simply because the district court improperly weighed the credibility of the evidence presented at summary judgment and granted summary judgment in favor of Southwestern Bell. The court incorrectly resolved factual disputes and ultimately sat in the shoes of a reasonable juror. Here are some quotes from the district court's opinion on summary judgment. Quote, the facts show that Hawkins was simply a bad employee, end quote. Whether she was a bad employee is a material fact issue for a juror to decide, not the court. Another quote from the opinion, Hawkins lied and made excuses for her poor performance and insubordinate behavior, end quote. What did the district court think that Ms. Hawkins lied about? Do you know what that refers to? I do. What we believe that the court was referring to was she lied about falsifying the court excuse document that was submitted when she returned to work, the ultimate document that they placed her on the decision-making leave or the DML, the probation for. That's what we believe that the court was referring to when they said that she lied, and ultimately that's a fact issue. Now, it wouldn't be, I mean, maybe you'd agree or not, but it wouldn't be enough just to show that there wasn't a problem with the court, the excuse, right? We need to find that AT&T didn't have a good faith belief in the validity of the excuse, right? Isn't that right? That's correct, Your Honor. So where's the evidence that shows that AT&T may not have had a good faith? In other words, it looked at the form and it kind of used that as a pretext. Right. So, Your Honor, we presented several, we presented both direct and circumstantial evidence as pretext to the court. We presented, first of all, direct evidence was the handwritten note that was placed in Mrs. Hawkins' file as the reason that she went on DML. Your Honor, the DML letter says that she was placed on DML for a violation of the code of business conduct, but stricken through that in handwriting of her manager says, should state customer mistreats or should state falsification of evidence. Your Honor, we believe that that was direct evidence that the reason, the stated reason was ultimately pretext. Well, I don't understand. If there, that seems to be confirming, I mean, I don't understand how is that direct evidence of pretext? The letter in her file clearly states that she was placed on DML because of a code of business violation. However, there is a handwritten note on the entry of that same letter that references the change in reasoning and attempts to correct the fact that the change in reasoning should have been different by stating, should state falsification of records. Right. They fixed their form. That doesn't mean that they didn't have a good faith belief that they, she falsified the reason. However, Your Honor, the . . . It doesn't matter whether or not the form is actually accurate. I mean, not the form, but the jury form, the jury excuse, the jury duty excuse. It doesn't really matter if that's accurate or not. It just matters whether or not the employer had a good faith belief. And I'm not even sure it matters about that because there were other independent reasons why she was terminated. I'm sorry, Your Honor. Maybe I was, maybe I answered confusing to the court. This is what Bell's letter said, not the court's letter. The court's letter was a standard work excuse. I still don't understand how that shows that they were in bad faith, that they were making up about the falsification. In fact, they were fixing their record to indicate that that was the reason. Well, Your Honor, we argue that the handwritten note proves that Bell's proper justification for her termination is false and unworthy of credence. Right, but isn't the reason for this termination not that she falsified the excuse? The reason for the termination is that she has two poor customer interactions. Isn't that correct? Those are the, she was on probation, but the termination event was the two poor customer interactions. That is correct, Your Honor. However, we argue that the DML was the vehicle that facilitated her untimely termination, but for her being on DML in the first place, those two bad customer mistreats would not have equated to termination per Southwestern Bell's own progressive discipline  That's where I don't understand, how do you know that? Because I don't see any comparators that had two poor previous, two bad interactions that didn't get fired. In order to show that that was pretext, you have to come up with two comparators. I mean, it's not two comparators. You have to come up with some comparators that would show that you could have two bad interactions and that normally you wouldn't be fired. Well, Your Honor, that was another issue for us, was our discovery, our discovery abuse. In our last attempt to discover relevant information about the case, we requested additional discovery, requesting performance evaluations and disciplinary actions for several newly identified employees. Before you get to the discovery dispute, though, do you agree, though, that you needed to be able to show that someone would not be terminated, regardless of whether they were on probation, for two customer interactions? Yes, I do, Your Honor, and I believe that the discovery would have shown that, however, we weren't able to get it. Okay, well, let's talk about that then, if you don't mind. Okay, yes, ma'am. Unless maybe they want to ask questions about the pretext, but the discovery, didn't they produce the comparator information timely in the discovery of the ones that you asked for when the district court asked, who are your comparators, they produced the entire file on those comparators in a time early on in the discovery, back in January or early in the spring? That is correct, Your Honor. Hawkins did identify several comparators in which the district court ordered for us to receive, you know, varying information about them. However, after Mrs. Hutchinson's deposition, that was the manager, after her deposition, we asked for additional information regarding, for example, the stack rankings report, her salary and commission information, and about information about other people on Hawkins' team so that we could further try to rebut their anticipated dispositive motions. We were denied. Why didn't you ask for information about other people on the team during the normal, as part of the comparators, or during the normal part of the discovery? Well, Your Honor, honestly, we didn't know those people would qualify as comparators until we started sifting through the information that Bell actually produced. They produced at the deposition a worksheet that listed some people who had had a certain type of report on them, which is not the same type of customer complaint that we're talking about, but it is kind of a culmination of those kinds of complaints. No, Your Honor, that's not my understanding of what they did. So what they did was they produced employee files, some of them outside of the relevant time period for the comparators at Hawkins noticed. Once we got that information, we then had the deposition of Mrs. Hutchinson. From that deposition, we received other information, we got other information and told the court, listen, Judge, we need additional information about these people, this is how this information came about, and we believe we should be entitled to that. But that wasn't in the deposition, because the boss's deposition doesn't mention these other people. It was a document that was produced, it's just a summary document, isn't that right? I believe it was the stack rankings report that you're referring to. That's where you got these other names, isn't it? Yes, Your Honor, that is correct. That's where we got those other names. Stack rankings report. The stack. Stack, right. Stack rankings report, which basically showed how other people on Hawkins' team compared how much they sold, etc., etc., so that's how we had identified those other comparators. After we identified them, we went back to the court in writing and during in-chamber conferences to say, listen, we need this additional information, we think that it's relevant to our case. Again, we were denied discovery. Were you seeking comparators relative to your case, you say? Was it for the ADEA claim or for the FMLA claim? Well, for both, Your Honor. You needed them for both? Yes, we needed them for both. And we actually identified a comparator that was similarly situated for our ADEA claim. That comparator was Jamie Hayward. We believe that Jamie met the comparator criteria. Hayward held the same position as Hawkins, which was the service representative. He was managed by Hutchinson, same as Hawkins, and for the 2013 performance year, Hayward accumulated zero absences under the FMLA. He accumulated two absences under the illness days and was not required to bring a work excuse back to work the following day after his absence. During 2014, Hayward took 20 absences, 20 illness days off from work. He accumulated zero absences under the FMLA. Again, Hayward was not required to bring a work excuse to return to work. What does that have to do with whether or not he was fired or not for having bad customer complaints? The fact that he didn't have to bring an excuse, the excuse thing is tangential. What is at issue is whether there are customer complaints and you didn't get fired or not. Your Honor, what we believe that proves is that Hawkins was treated, I mean, I'm sorry, Hayward was treated more favorably than Hawkins because he didn't take any leave under FMLA. That's how we believe that relates to that. I'm sorry, but treated more favorably in a, it has to be in the reason that she was terminated. Yes, Your Honor. She was terminated for bad customer reports. Missing work and bad customer reports are two different things. Help me here. Your Honor, again, we asked for additional discovery regarding Jamie Hayward's grievances. We asked for any information regarding their employment file. Now, you don't have your ADA. We were denied that information. Okay, but you were denied that information when you asked for it after the summary judgment motion was filed on that very same day. No, so. You didn't ask for it until the time the summary judgment was filed, did you? No, I believe that that was the second discovery motion that you're referring to. This is the first discovery motion that we filed. We filed several throughout the course before we got to dispositive motions. The first, the first discovery motion that we filed, we asked for, specifically for Jamie Hayward's comparator file, I mean, during the relevant time period. Because one of the other issues that we had with Bell was that they produced these employee files, but they were outside of the relevant time period. We only needed employee files during, for the 2013-2014 performance year. Okay, so it's just Jamie Hayward that's the problem then? Jamie Hayward is one of the problems, yes, Your Honor. Jamie Hayward is the problem for, and you, that is before the summary judgment, you asked for and were denied Jamie Hayward. Is that correct? That is correct, Your Honor. But on these other people off the stack list, that was not until the day of summary judgment, was it? Yes, Your Honor. We did ask for a, a sec, we asked for an additional request for, for a discovery motion asking for the new people that we identified per the stack rank reports. On the day that summary judgment was filed? That is correct, Your Honor. So, maybe, one thing, you, you, you keep coming back to we were denied discovery that we needed, right? That seems to be a big part of your argument. Yes, Your Honor. Now, so you're asking us to review a discovery order by the district court, which is reviewed for abuse of discretion, right? That is correct. Could you articulate for me, why did the district court abuse his discretion in denying the discovery that you thought you needed? I mean, we may, I may or may, may or not, may or may not agree with you that you might have been helped by this information, who knows, but, but we're, we're looking at the case and managing discovery, so. Well, Your Honor, there was no reason to preclude Hawkins from conducting the necessary discovery in the case and certainly no reason to deny Hawkins an opportunity, for example, to take the deposition of Tandrea Hutchinson, which is the person that issued the, the work excuse to Hawkins in the first place. There was a genuine issue of material fact that existed already because of the submission of conflicting affidavits. We had the affidavit from Bell that stated that Ms. Hutchinson said one thing and we had our affidavit that stated that Ms. Hutchinson said another thing. There was no reason for the court to preclude us from taking that deposition. So you're saying the fact that you were, that your client was on probation, made the two complaints against her, like the last straw, the final straw. You couldn't have any, any problem while you're on probation. That is correct, Your Honor. Were you able to locate comparators who may have been on probation but were not fired for, um, for issues that your client would equate to having bad customer reports? Um, no, Your Honor, we were not able to locate any comparators, but again, but for her being wrongfully placed on DML, she would have never been on probation, so she never would have been eligible for termination. The DML is the thing that we want for this court to look at. That, that's the ultimate point of, uh, contention in the case. So if, if they believe that she would have been terminated regardless with those problems, you, you, you, what would you say to that? I would say that that, it would be against Bell's progressive discipline policy. Their progressive discipline policy says that you're not terminated for your first infraction. Secondly, the, the second, I'm sorry, we're out of time, but this, the second, the second motion for discoverable evidence that we filed with the court, we identified comparators that had gotten CRF scores below the standard and had not been terminated. So we know that, that just because you get a bad CRF score, just because you get a bad call doesn't mean you're necessarily going to be terminated. Is Hayward even mentioned in your appeal brief? Yes. Yes, ma'am. So, um, Hayward is mentioned both in, um, appellant's brief and our reply brief. Specifically about that that's the one that was the bad. Yes, Your Honor. And, um, referencing all of, um, the places in the record where, where we believe the information comes from to support our position. Okay. Thank you. May it please the court, Joyce Holloway for AT&T, the appellee and the defendant below. Mr. Hayward was identified by the, um, plaintiff appellant early on in this case as a potential comparator. There's a series of discovery orders, no doubt that the court is familiar with, but early on, the district court asked the plaintiff, identify your comparators, and then instructed AT&T to provide information to the plaintiff as to those potential comparators. Mr. Hayward was identified back in April of 2018, and we complied with the district court's order by providing information about Mr. Hayward. So, Mr. Hayward isn't a late discovery issue. Did you, is there something about him that was not provided? No, and we would agree with the court that he's not a proper comparator. Under the seminal case from this court in Lee v. Kansas City, a potential comparator is somebody who has the same position as the plaintiff, has the same supervisor as the plaintiff, but most important for this case, has the same violation history as this plaintiff. And we keep hearing about Mr. Hayward's leaves of absences and his not, he didn't have to come back with a work excuse. That's irrelevant. The question for, to make him a proper comparator is, does he have a similar violation history? Was he egregiously rude to two customers, and did he then be, was he then reprimanded? There's nothing in the record about that with Mr. Hayward. He's just not a proper comparator. Why, let's talk about the people that are on the, the step list, the list that was believed at the deposition. Those, that might contain comparators. Well, what happened, Your Honor, is that Ms. Hutchins' deposition was taken on June 29th, and so then after that deposition, the plaintiff went back to the district court and said, I need some more discovery. And one of the things I need discovery about is some employees in Ms. Hawkins' group that also had low, what we call, CRF scores, which I'm not sure what that acronym stands for, but it's customer surveys that are taken after a call. And so, that request was made by the plaintiff on June, on July 11th. There was a hearing that day, and at the end of that hearing, Judge Hughes said to AT&T, you need to provide this information. And that day, on July 12th, Judge Hughes entered an order requiring the CRF scores for the employees in the Hawkins section to be produced. That order is found at 144 of the record. He required us to provide that information by July 19th. We complied with that order. There's no question about whether we complied with that order or not. And then Ms. Hawkins waits until April 10th, three weeks later, to ask for additional information. I'm sorry, August 10th. August 10th is a critical date, because that's the date that Judge Hughes also specified as the date that we could file our motion for summary judgment. We've never heard an explanation as to why there was this three week period. But we had already provided this information. What was different about the request on August 10th to what you had already produced in July? It identified new potential comparators. Back in April of 2018, Ms. Hawkins identified seven potential comparators. Now she's got a new list of potential comparators. And so that's the difference on the comparator issue. Were the comparators being produced by your client? Were they in support of the ADA claim or the FMLI claim? That's an excellent question, Your Honor. I think one of the problems with the way that this case has been presented by the plaintiff, no disrespect taken, is that she started off with five causes of action. And her discovery doesn't really match up. You know, discovery doesn't need to, to say what I need the information for. Now where we are is that we moved for summary judgment on her disability discrimination claim on the basis that she did not have a potential viable comparator. And she has not come back and raised a fact issue on the, yes, on the. What about the FMLA claim? We did not move on that basis. We, on the basis for the FMLA claim, our argument was she had no, she couldn't make her prima facie case on the causal connection between the protected conduct, her taking leave, which leave expired in April of 2013, and the adverse employment decisions because it was too long of a gap period. Now, we, on the comparator issue in the FMLA context, the cases are somewhat inconsistent on whether that's a requirement that the plaintiff has to shoulder. But we didn't move for summary judgment on that basis, so the court doesn't need to address it in this case. So is her claim still alive? Her retaliation claim? No, we've gotten- Family leave claim. No, no, her FMLA retaliation claim, we obtained summary judgment on that claim. And she has appealed that case. Excuse me? She failed to make her prima facie case. Yes, but even- What if we disagree that she made a prima facie case? On her FMLA claim? Yes. What do we do then? Can we- Well, we also- Text or- We also moved for summary judgment for, let me just back up. She's, for purposes of this appeal, she has two claims. ADA discrimination and FMLA leave retaliation. For each of those claims, we moved for summary judgment on two bases. Number one, she couldn't meet her prima facie requirements. But then we also said for each of those claims, assuming she can, she cannot rebut or articulate a legitimate reason for making the adverse employment decisions that we made. So in answer to your question, Judge Elrod, if you agreed with her that she didn't meet her prima facie case on her FMLA claim, we would say that summary judgment should still be affirmed because she did not refute with competent summary judgment evidence our legitimate articulated reason for taking the employment action that we took. And the reasons that you would point to are the customer complaint issue, the failure to deal with the customers appropriately? Okay, this gets a little bit complicated. For the FMLA claim, both employment decisions are an issue. We would have the probation issue and the termination issue. On the discrimination claim, the ADA discrimination claim, under this case court's case law, you have to have an ultimate employment decision and probation is not an ultimate employment decision. Okay, I was asking about the FMLA. On the termination claim, we had legitimate reasons for each of those decisions for the probation. We had a good faith belief that she falsified a court record and on termination that she was extraordinarily rude to two customers. What if we thought there was a factual issue on the falsification? It wouldn't... Could we sort of say, well, even assuming there's a factual issue on that, we've got the customer relationship issue? Yes. Yes, you could. But I would say that you have to find there's a factual issue on whether AT&T had a good faith belief that she falsified the court record. We could be wrong and we could still have a good faith belief and there is evidence in this record that the attendance manager was suspicious about the timing that was recorded on the work excuse and called the court clerk and was told that court let out that day by 3.30. Is there evidence why there was suspicion about that to begin with? The five... It says 5 o'clock on the court excuse and the evidence is that there was a question whether it was originally a one and was changed to a five. That was what raised, and I think also just the time, that it was at 5 o'clock. But the attendance clerk who called, is that a different person than her boss who would have gotten a bonus... who was getting bonuses and they went down, the amount of money that she made because she was on the leave earlier? Yes. Ms. Hutchinson is her boss, her supervisor. The attendance officer and attendance manager is Bridget Ford. Ms. Hutchinson, whose compensation allegedly would have gone up and down based on Ms. Hawkins' performance, had absolutely nothing to do with what happened with the falsified court record. She did not report that or she did not participate in the chain in any way? Her only participation was pursuant to union procedures. When Ms. Hawkins was upset about what happened, about being placed on suspension, there was a grievance hearing, which they call a court... a day in court proceeding. Ms. Hutchinson, the supervisor, attended that meeting as a note-taker, but she had no personal knowledge of any of the facts regarding that Ms. Hawkins had gone to court that day. But she did not influence the decision to place her on that? Because there's arguably... she had a motive to have lied about what the court clerk said, if she were the person on the phone with the clerk. I would not agree that she had a motive. A motive being that she's mad because back before, she didn't make as much money off of her. Right. We're now eight months later after. I know, but she's still holding a grudge. OK. Let's go with you that she's holding a grudge. Let's go with that. Let's assume that. This is not hypothetical. OK. She's holding a grudge, but she didn't participate in any way. She's not a decision-maker on the suspension. She's not a decision-maker on the probation arising from the falsified court record. Her role was she was a note-taker, and she also then prepared the letter that went to Ms. Hawkins on the day after the court, the day in court proceeded. Your name is on a letter. Her name's on a letter. But you didn't... No. That's odd. If you look... You would be the signer of a letter, or preparing a letter, and you're not involved. Because she is the supervisor. But if you look at Ms. Hawkins' deposition testimony, she agrees that the decision-maker on the suspension, when she was suspended the day after she came back from court, was Bridget Ford. The decision-maker on probation was Kathy Mattis, who's the manager. She never identifies Ms. Hutchinson as a decision-maker in connection with the falsified court record. Ms. Hutchinson sent the letter because it's part of her supervisory responsibilities. When somebody in her section is put on probation, she goes to her desktop, she pulls off the appropriate template, and she records for the employee, you're on probation, this is how long the probation is. If you have another code of conduct violation, it may be grounds for termination. But she had been terminated, but for the fact that she was on suspension, or probation? Yes. Let's put the falsified record and probation in a bucket way over here. If you are rude to two customers, and the customers report it, and they're very dissatisfied, that is a basis by itself for termination. Somewhere we could find that in the record. It's in the code of conduct, which is attached to our summary judgment motion. OK, but what if the opposing counsel says, well, it's progressive discipline, so you can't just go to that? Well, she did ask Ms. Hutchinson about that very issue in Ms. Hutchinson's deposition, and Ms. Hutchinson explained that we do have a progressive disciplinary procedure, but that procedure also allows in egregious situations for us to go straight to termination. This was an egregious situation. Ms. Hawkins did not deny that it was an egregious situation. When she's questioned about these two customer complaints, she says, I failed in my job. Is the record of her interactions with those customers, is that in the record? It is in the record. The recorded phone calls are in the record. They're part of Ms. Hawkins' response to our summary judgment motion. They're transcripts of those calls. Did that get brought up? Excuse me? Did that get brought up in the appellate record? Yes, it is. It's attached. I don't remember the site right off, but it's probably in the 800s. And we can go listen to those, maybe some of them. Oh, the transcripts in the record, not the tape. The transcripts. We can read the transcripts. In your view, what shows the egregious nature of the interactions? I'm just curious. She was very rude to both customers in that she talked over them when they said that, you know... She's in the retention department. Customers call, they're already upset. They're looking to sever their relationship with AT&T. So AT&T trains employees like Ms. Hawkins on how to be empathetic, how to keep apologizing, how to keep making... Do whatever you can to make sure that this customer stays and doesn't go to the competitor. Rather than show any empathy, Ms. Hawkins, on those two occasions, showed a complete lack of empathy. She kept talking over the customers. She disagreed with the customers rather than agreed with the customers. I was a bartender and a waitress years ago, and we were taught on day one, the customer's always right, and that transcends to most every other service industry, right? Ms. Hawkins knew that. And as she said, when she was questioned about it, I just got fed up. I failed. And then when she was asked a little bit more about it, she said, I take the fifth. So there's no dispute here that she had very poor communications with two customers. Those customers were sufficiently upset that they then answered the surveys and told that they felt very disrespected, they felt that Ms. Hawkins was unprofessional, she was discourteous to them. By itself, again, putting the probation in a bucket off to the side, customer mistreat is by itself a valid basis for termination. Now, the court may think it's too harsh. She'd been working there a long time. But as this court has said in many discrimination cases, we are not in the business of second-guessing employment decisions that are made by companies. So this person that had this interaction, I'm trying to press the idea that the court didn't allow the deposition of the court clerk. in the state court. The person who had the interaction, she's not on any... There's nothing in the record that would tell us that she had anything against the plaintiff, or the plaintiff and her were in any kind of out-of-sorts relationship. No. There's other names that are mentioned in the record, another attendance manager by the name of Ms. Hodges, who apparently on occasion did make derogatory comments about Ms. Hawkins' absences. But not... No, not that I'm aware of. Because, you know, it's... A lot of courts just put the end of the day so they can do their forms in the morning and then they hand them out. And leave it blank, right? Or they leave it blank or else they go ahead and put 5 o'clock because they know that they'll be done by then for sure and then they don't have to look at the forms or compare as the people leave. So you're not arguing... I'm not arguing one way or the other. Whether it's right or wrong. Whether it's right or wrong. I mean, again, this court can assume that Ms. Hawkins is telling the absolute truth. In fact, we should assume that. Yes, that's fine. Especially because we didn't get the other testimony. Well, let me also say that Ms. Hawkins could have subpoenaed the court clerk. And Judge Hughes did say to Ms. Hawkins' counsel, there's subpoenas, and Ms. Hawkins' counsel did not go back to the court and ask for a subpoena. But this is a red herring again because we only have to show we had a good faith belief. And based on the attendance manager's telephone conversation with the court clerk, she thought that the record had been falsified. But what did she say? What did the court clerk tell the AT&T employee? Well, there's a report of that in the record attached to Ms. Ford's affidavit where the court clerk said that we were done with court by 3.30 and the judge was gone by 3.30. Docket was ended at 3.30. And did they ask her what she filled out on the report? No. No, they did not ask her that. So there's a lot of questions that, you know, in a different . . . A lot of facts, recall. Yes, but they are facts that do not raise an issue of material fact in this case. Well, when I asked counsel opposite what did raise a fact question as to AT&T's good faith belief, she pointed to an entry that had been crossed out or added to. Yes. So are you aware of that? Do you want to respond to that? Yes. So that was, again, after the day in court proceeding, which was all about the falsification of records, Ms. Hutchinson, her supervisor, went to her desktop to do the letter, and she pulled out the wrong template. She pulled out the template that puts employees on probation for customer mistreats. She fills out the information. She prints it. And then she realizes, I used the wrong template. So she crossed it out, and she cured her error by writing it in falsification of records. And this was long before the bad interactions with customers, right? Yes. This was in February. I'm sorry, March 2015. I'm sorry, 2014. And the customer interactions happened in September of 2014. So, yes, we are months apart. But, again, this goes to the disability discrimination. The probation is a non-issue, because that's not an adverse employment decision that's relevant in an ADA discrimination claim. It's only relevant for the FMLA claim. But then we have the issue that this happened so far after she returned from leave that there's just no causal connection, which, again, was the basis for our motion for summary judgment that she couldn't leave her client. The termination is 15 months. How far is it, the actual termination from when she returned to leave? Fifteen months. It's actually longer than that, because she came back from leave in April. She exhausted her FMLA leave by April 12th of 2013. We extended it until early June. If you use the April date, it's actually 17 months. But this court, just in Garcia, last month, two members of this panel, had this issue about what lapse of time is too great. And you went back to the strong case and the whole reason for this, and you said four months is the very outside. We don't have anything that comes close to this. And let me just, if I could just take one more minute, because Ms. Hawkins did raise in her reply brief this idea that there was a 40-day gap between protected conduct and an adverse employment decision. But that 40 days is a date that is triggered, she claims, by intermittent leave that she started taking in December of 2013. That intermittent leave was not under the Family Leave Act. Again, she had already exhausted her Family Leave Act months earlier. So that cannot be protected conduct. Is there any reason why we shouldn't look at the end of the FMLA leave as the relevant date, right, between the termination and the date? You said there was an additional leave. I understand that. But that wasn't FMLA leave. No, it wasn't. It was AT&T. Right. So I don't understand why we shouldn't look at the end of the FMLA leave as the relevant date  No, no, you should. I agree, Your Honor. But they're raising in their reply brief that you can look at this other period that's later to close that gap so that it comes within this Court's four months. And it just can't. If there's no other questions. Thank you. We have your argument. Thank you very much. So, Your Honor, even if this Court does not find that the stated reason for termination was pretextual, we argue that Bell's decision to place Hawkins on a DML and subsequently terminate her employment contain mixed motives. And even if Hawkins concedes that discrimination was not the sole reason for her discharge, discrimination certainly was a motivating factor in her termination. Hawkins had already been out of her cell seat for months with more leave to follow. We believe that a reasonable jury could find that Hawkins' FMLA leave was a motivating factor or a negative factor. You argue this case as a mixed motive case. I understand that there's a slightly different analysis if you're talking about a mixed motive case. Yes, sir. Have you argued this as a mixed motive case? Yes, sir. Both in our response to their summary judgment and in our appellate's brief and our reply brief, we give both arguments there, Your Honor. Even more compelling is Mike. Fifteen months. Fifteen months. Is there any case in the circuit history, and we've looked at this recently, that has said that you could have 15 months to make your prima facie case, that that would make your? No, Your Honor. I'm not aware of any case. But even as Judge Duncan talked about when my opposing counsel was here, even if it can be argued that the end of Hawkins' FMLA leave was the relevant date, that still gets us much closer to the strong test than we were before. Four months is the outside amount under this circuit's precedent. Do you get anywhere near four months? How do you get there? Well, our argument was that the DML occurred approximately 40 days from the time that Hawkins began taking her intermittent leave. That was in January of 2014. If the court talks about the end of FMLA, that's just in December of 2013. So that happened within 40 days, not to mention Hawkins filed her first EEOC charge. She returned from FMLA what day? If you don't know, then. I'm sorry, Your Honor. I don't have it right in front of me. I apologize. Then go on. You can go ahead and argue something else, and I'll look it up myself. So, Your Honor, going back to whether Bridget Ford had influence or control over the decision making, Your Honor, we argue that Bridget Ford was the person that started the alleged investigation regarding Hawkins' absence on the day she went to court and that she had influence, leverage, and control over Hutchinson. Attendance managers like Bridget Ford report attendance. They investigate attendance. They decide whether they will require a work excuse when an employee is out. And in this case, Ford contacted the court clerk to determine whether Hawkins actually attended the day in court and what time she left court. Did you subpoena? The counsel on the other side says there was no subpoena of the court clerk. No, we did not because she was denied that we could get a subpoena at the time that we requested. You asked for one? We did ask for a subpoena, Your Honor. In any manner? Yes, sir, we did during our in-chamber conferences. Yes, we requested a subpoena of the court clerk to which she denied. I thought he said you could subpoena. No. That was a method that you could use. He said that we could not take her deposition and that we could not subpoena her. What about getting an affidavit from her? Just go over to the court and say, hey, will you sign this if you remember the conversation? Your Honor, she refused to talk to us. We had investigators, our paralegals called. She refused to converse with us as an employee of the court. Can you help us? How does any of this affect your ADA claim? All that we've been talking about. Well, Your Honor, again, we go back to the same pretext argument that we had prior, the same pretext analysis flows for our FMLA retaliation claim and our disability discrimination claim. We really want the court to take into consideration this handwritten note that we find is direct evidence of pretext. So you heard the explanation from opposing counsel about the note, right? Why is that wrong? Why should a fact finder be able to draw different inferences from that note? Well, Your Honor, we feel like the fact that the handwritten note says should state falsification of records just makes it unworthy of credence. And we believe that this is a fact issue that a fact finder should determine, not the court. But the handwritten note doesn't have anything to do with the ADA claim because that doesn't matter about the probation for the ADA claim. That's not part of it. Well, Your Honor, again, the information that we asked for with regard to the ADA claim, specifically speaking about Jamie Hayward, we were denied additional information about him. What additional information could you have gotten? You already had all of his materials. Well, that's just it, Your Honor. We believe that we were supplied information regarding Jamie Hayward outside of the relevant time period. The relevant time period here is 2013 to 2014. We have disjointed employee files, some from 2011, some from 2015, 16. All we simply needed was 2013 to 14 in order to make our case on behalf of Mrs. Hawkins. Your Honor, in conclusion, we believe that Bell relies on customer mistreatment as its excuse for termination, but we have so many other shreds of evidence. We have the handwritten note on the DML letter. We have the derogatory statements made by Hutchinson. We have a clear motive for Hutchinson to retaliate against Hawkins. We have the day in court transcript that conditions Hawkins' return on DML to, you know, for her, she has to be there every day in her seat. That's what her supervisor said. Hawkins leave, I mean, even if the court doesn't find that pretext exists, at best, this case should be analyzed under the mixed motive theory. The big story here is Hawkins' lack of attendance at work, but for her disability and FMLA leave, she would have been at work generating revenue. All of the issues stem from her absence. We have your argument. Your time has expired. Thank you for your time.